## Commonwealth v. Dearolph

*W. P. Geary*, district attorney, and *A. A. Geary*, for Commonwealth.

*Merritt H. Davis* and *R. R. Whitmer*, for defendant.

RIMER, P. J., May 17, 1941.—Frank Dearolph, also known as Frank Derolph, defendant in this case, was on February 17, 1941, indicted in this court for the murder of R. L. Wenting. He entered a plea of guilty to this indictment on April 2, 1941. Under this plea we are directed by section 701 of The Penal Code of June 24, 1939, P. L.

872, to "proceed by examination of witnesses, to determine the degree of the crime, and to give sentence accordingly."

A further provision of said act directs that "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life."

Under the same section where the killing is "wilful, deliberate and premeditated" it is murder in the first degree.

Throughout all the proceedings in this case subsequent to the information and the arrest of Derolph in this case, the rights of defendant have been guarded by counsel appointed by the court on the petition of defendant, which set forth that he is wholly destitute of means to employ counsel and prepare his defense. Upon the petition the court appointed Merritt H. Davis and R. R. Whitmer, members of the bar of this county, as his counsel, and they have carefully and efficiently defended him throughout all the subsequent proceedings. Before his arraignment counsel for defendant filed a petition setting forth their belief that there was a serious question as to the soundness of mind of defendant, based upon their observation and investigation, and prayed the court to appoint a qualified psychiatrist to make mental examination of him and report to the court, such report to be available to counsel for defendant and the district attorney. Upon this petition the court appointed Dr. C. H. Henninger, of the Jenkins Arcade, Pittsburgh, Pa., a fully-qualified psychiatrist of high standing, whose report was filed with the court on March 29, 1941. Substantially, the findings of his report were to the effect that defendant was not insane when he committed the offense nor at the time of the examination and was then mentally capable of entering a plea. He added the following opinion:

"It is also my opinion that the illness and damage to his brain when he was paralyzed, and the fact that he is now suffering from syphilis and has a changed personality,

should be taken into consideration if he should plead guilty."

Then followed the arraignment of defendant on April 2, 1941, at which defendant was attended throughout by his counsel and entered a plea of guilty.

Under section 701 of The Penal Code of June 24, 1939, P. L. 872, supra, the first duty of the court is to determine the degree of the offense, whether murder of the first degree or of the second degree. To reach a conclusion on this we have the definition under the above section of The Penal Code to guide us. If the killing is wilful, deliberate, and premeditated, then it must be declared murder in the first degree. Lacking these essentials or any of them, it is murder in the second degree. This renders it necessary to review briefly the circumstances surrounding the killing, not to determine the guilt of defendant, for that is admitted, but to determine whether the three above essentials are to be found, and to that end the court finds the following facts from the evidence presented at the hearing, viz:

(a) Throughout these findings we have adopted the spelling of defendant's name as given by him "Derolph", although that family throughout this community have generally spelled the name Dearolph.

(b) On or about December 20, 1940, Derolph, then employed at Youngstown, stole a revolver at that place with the specific intention of shooting R. L. Wentling of Beaver Township, Clarion County, Pa., who admittedly, was on December 27, 1940, at his home in the said Township of Beaver, shot and killed by Derolph.

(c) Derolph, leaving said City of Youngstown, wandered about the country some five or six days, purchasing shells somewhere for the stolen revolver and arriving at his brother's home in Oil City, Pa., on Christmas day of 1940. Leaving that home the next day he continued his erratic wandering until he arrived at the Wentling home about 5:15 p.m. of December 27, 1940.

(*d*) The family of R. L. Wentling, then present at his home with him, consisted of his wife, Mrs. Olive Wentling, a daughter, Elizabeth Wentling, aged about 22 years, and a son, Ronald Levi Wentling, aged about 12 years, then all in the kitchen preparing for the evening meal.

(*e*) When Derolph came into the kitchen, after shaking hands with Mr. Wentling, a general conversation followed for a short time. Thereupon Derolph joined the family in their evening meal. Mrs. Wentling, however, leaving the room to go upstairs before the meal was served, was not downstairs again until after the subsequent tragedy.

(*f*) A short time after the meal had been eaten Derolph left the house. Mr. Wentling joined his wife upstairs, leaving Elizabeth and her brother in the kitchen. In a short time Derolph came back, saying he had lost a glove, and borrowed a lantern to look for it. Apparently making search in the direction of the barn he came back in a very short time and returned the lantern.

(*g*) Entrance to the kitchen of this home is through an enclosed porch, in effect a small room, with the outer door directly facing a small room adjoining a porch and called a pantry. The door from the kitchen is to the left of a person standing at the pantry door and facing the outer door of the porch and one approaching through the kitchen is in plain view of the person so located.

(*h*) After he returned the lantern Derolph was in the kitchen for a few minutes and Elizabeth was in the porch room. Her brother followed her there and was almost immediately followed by Derolph who took his stand at the pantry door with the kitchen door to his left and Elizabeth and her brother to his right along the side of this small room. He pointed the revolver at them and ordered Elizabeth to call her father down. When she attempted to give any warning he restrained her by a threatening shake of the head, constantly keeping the revolver pointed in the direction of Elizabeth and her brother. Elizabeth

did call her father and very shortly thereafter he came downstairs and into the kitchen. As Mr. Wentling approached the kitchen door Derolph turned to his left and shot him. Mr. Wentling swerved to his left and back of the kitchen door which had a large glass panel and again, almost instantly, Derolph shot him, the bullet passing through the glass panel. One of these shots pierced Mr. Wentling's abdomen, but he was able to get back upstairs, escaping thence through a bedroom window, and later being taken to a hospital at Oil City, Pa., where he died from this bullet wound about 12:20 a.m.

(i) In addition to the above facts, all going to establish that this was a cold-blooded murder, we have the testimony of Derolph himself, differing slightly from that of Elizabeth in that he states he had gone out of the house after leaving the lantern and then stopped at the gate between the house and the barn where he stood for a few moments, then finally determined to go back in the house and shoot Mr. Wentling.

(j) In accepting the plea of guilty in this case and in connection with determining the degree of guilt, we find that at the time of the commission of this offense Derolph was sane, having knowledge of right and wrong and of the nature of his acts in committing the offense and the legal penalties therefor. We find this not only from the evidence but from the report of Dr. Ira A. Darling, a qualified psychiatrist, which will be mentioned later. In addition to this, there is the legal presumption of his sanity at the time and the time of the hearing which has not been overcome by any evidence. Therefore, we find that in the killing of R. L. Wentling, under the circumstances above described, Frank Derolph was guilty of murder in the first degree. The killing was "wilful, deliberate and premeditated".

Under our statutory rules as to what constitutes murder in the first degree, a rule which is but a restatement of a common-law rule in this matter, we readily come to the conclusion that defendant here was guilty of such first

degree murder. In so doing, our first duty under the Act of May 14, 1925, P. L. 759, has been discharged without difficulty. The facts are so clear and the precedents so definitely established that no other conclusion could be reached.

Now we come to the difficult part of our duty in this case, which is the determination of the penalty which should be inflicted, whether it shall be death or imprisonment for life. The great difficulty here is to approach this subject free from prejudice. By this we mean, first, any personal prejudice the court might have against the taking of human life. The second is the very human prejudice that must arise in the breast of the court as an individual because of the very brutal and bestial acts and occurrences surrounding this murder. A bare recital of these results in an instinctive desire to decree the absolute extermination of this defendant as one would order the extermination of noxious and poisonous vermin found in the homes of our community. But this easy solution is not permitted to the judge upon whom is placed the burden of deciding this issue. In reaching this decision we have no aid from our statutory provisions and only very general rules of conduct from our decided cases. Some of these will now be cited for our guidance. In the first instance we must be instructed as to what evidence may be received, including the sources from which it may be taken, by the court, and the manner of its presentation. Here the question is presented as to whether or not this defendant, at the time of his commission of this most revolting offense and the circumstances attending its commission, was a normal human being. If not normal, to what degree was he abnormal and, consequently, what was the degree of his responsibility? We note first this extract from the opinion of Mr. Justice Kephart in Commonwealth v. Iacobino, 319 Pa. 65, 73:

"Such an inquiry is directed to the conscience of the court, and the court, both under the applicable statutes

and under the common law, has a wide latitude in order to inform itself fully as to the prisoner's condition."

Again we draw upon the opinion of Mr. Justice Drew of our Supreme Court in Commonwealth v. Hawk, 328 Pa. 417, 419. That was a case in which there was a plea of guilty to an indictment of murder. The procedure is similar to that in the present case. The court below, after hearing, found defendant guilty of murder in the first degree and fixed the penalty at death, and from this an appeal was taken. Counsel for defendant urged that, while defendant had intelligence and was responsible from a legal standpoint for his crime, he was not as responsible for his acts as a normal person and, therefore, should not be subjected to the extreme penalty of death but be sentenced to imprisonment for life. This position conceded that the finding of first degree murder was proper. However, when we come to the facts there is considerable variance. The crime was particularly inhuman and atrocious. The court below found and stated:

"For the purpose of avoiding an expedient marriage, defendant attempted to murder by burning his fiancee, her mother and sister. The murder was carefully planned and carried out, and concealed with such cunning that only the escape of his fiancee and her accusation that he had been present at the time and place led to his confession."

The mother and sister were burned to death.

Defendant was 20 years of age at that time, of average education and intelligence, having left high school to go to work. He was a faithful and industrious employe, and of good reputation. Four psychiatrists called, two for the Commonwealth and two for defendant, agreed that defendant knew right from wrong, knew the consequences of his act so far as his intelligence was concerned, but was so defective emotionally that he did not fully realize what he was doing, and was not as responsible as a normal person, declaring that he was emotionally inadequate. In its consideration of this case the court stated the following rule:

"Murder of the first degree should not always be punished by death; when sufficient mitigating circumstances are present, the punishment should not exceed life imprisonment. The discretionary power given to the tribunal charged with the duty of hearing and deciding upon the evidence must not be abused. It is only to prevent such abuse that this court will interfere. There are no fixed or arbitrary standards provided by law regulating the exercise of that discretion: *Commonwealth* v. *Harris*, 314 Pa. 81; *Commonwealth v. Sterling*, 314 Pa. 76. The guiding principle is that a sound discretion must be applied to the acts and circumstances of each case."

The facts in the case of Commonwealth v. Howell, 338 Pa. 577, are more closely applicable to the present case than those in the case above cited. Howell entered his plea of guilty to an indictment for murder and was adjudged guilty of murder in the first degree with the penalty of death. Upon his appeal the judgment of the court below was affirmed. The pertinent facts are that this defendant quit school when he was 16 years old and then in the third grade. He had been guilty of larceny and served time for that offense. Again arrested and while the arresting officer had his back turned, he seized the officer's revolver and started shooting at him, wounding him. A third officer intervened, defendant and he each shooting at the other, defendant therein being wounded and the officer killed.

A psychiatrist, connected with the Municipal Court of Philadelphia, testified that in his opinion "Howell is high grade feeble-minded, he is dull and apathetic, with little judgment or reasoning ability." Defendant had been subjected to a test (Revised Stanford-Binet Intelligence Scale) by an officer of the same court, who reported that he had a mental age of 7 years and 3 months. It is generally conceded that the judgment that defendant was guilty of murder in the first degree was sustained by the evidence, but it is urged that since he was suffering from a mental condition scientifically known as "high grade

feeble-mindedness, with consequent diminution of responsibility for his acts," the sentence of death should not be imposed but rather that of life imprisonment. The Supreme Court cited the opinion of the court below, in which this statement occurs:

"Even though he be a high-grade feeble-minded person, dumb and apathetic, the court had an opportunity to observe his conduct, his emotions and his reactions. Even a layman can form an opinion of a person's mentality."

The decision of the court below was that there was no evidence of such mental weakness manifested by defendant, either before, at the time, or after the commission of his crime, to justify life imprisonment in preference to the death penalty.

It will be noted, however, that the Supreme Court in affirming this judgment made the significant remark:

"The point now for consideration is not whether this Court would have imposed the death penalty but whether the discretion vested in the court below 'was judicially exercised, whether the record shows a case in the class justifying sentence of death, or in a class justifying the lower sentence of life imprisonment.' *Com. v. Garramone*, 307 Pa. 507, 513, 161 A. 733. Was there abuse of judicial discretion confided by the statute to the court below?"

The Supreme Court stated its conclusion that there was no abuse of discretion in the court below in imposing the death penalty.

The opinion of the court below in this case did not receive the same approval as did the opinion of Judge Davison in Commonwealth v. Hawk, supra, where it was stated by the Supreme Court that perfectly clear and full consideration was given to the evidence and that the discretion vested in the sentencing judge was wisely and judicially exercised, defendant Hawk being as responsible for his acts as a normal person.

In Commonwealth v. Garramone, 307 Pa. 507, 514, we find the duties of the trial court indicated by the opinion

of Mr. Justice Linn. There defendant had entered his plea of guilty and was found guilty of murder in the first degree and the death sentence was imposed by the court, under the Act of 1925, supra. In defendant's absence from his home, as a result of a childish altercation between members of his family and the family of a neighbor, defendant's son was struck by the neighbor and rendered unconscious. When defendant came home and heard the story, he shot the neighbor, who died shortly thereafter. The Supreme Court vacated the sentence of death and instructed the court below to enter a sentence of imprisonment for life, making this statement:

"This is the case of an industrious man without criminal record, whose character as a peaceful law-abiding citizen was testified to by a number of persons. After he returned from his day's work and found his wife and son in the condition described, he committed the crime under the resulting provocation, and in circumstances, which, we think, place him within the legislative classification requiring the milder of the two possible sentences. The imposition of a sentence of death, instead of life imprisonment, was such abuse of discretion as to require modification by resentence."

In the case of Commonwealth v. Scott, 14 D. & C. 191, defendant entered his plea of guilty to an indictment for murder. He was an able-bodied man aged about 46 years and murdered his widowed aunt aged about 77 years. For 30 years he had lived in her family on a farm, no one else living with him. His aunt was moving to a neighboring village but defendant was not to go with her. One morning he choked her to death with a small rope and then visited about the vicinity until the afternoon. Stating that he found her dead on the floor, he called in one of the neighbors and asserted that his aunt had died of heart trouble. Only after it appeared that she had been strangled did he admit his guilt and then asserted that the choking had been only slight and only when he had been attacked by his aunt with a poker.

An accredited specialist testified that he was mentally defective but not insane. Giving the three grades of feeble-mindedness, the high grade, the middle grade, and the low grade, the latter being just above imbecility, he said that the Stanford Revision intelligence test showed defendant to be middle grade feeble-minded, about sixty percent up to normal and of nine-year-old mentality. The crime was cunningly planned and carried out and for a time it seemed as if defendant's statements might be accepted and the death to be from heart disease. A number of defendant's neighbors testified that he was not of normal intelligence. One of them, however, said that he had the mind of a normal man. Determining that defendant was guilty of murder in the first degree, the court held the evidence was "effective in leading to the conclusion that the lesser penalty should be fixed", imprisonment for life. This decision was made under the Act of 1925, judgment being entered on June 17, 1930.

The case of Commonwealth v. Ritter, 13 D. & C. 285, is cited, not so much upon the grounds that the facts are identical although quite similar in essentials, but because of the carefully-considered and scholarly opinion therein by Mr. Justice Stern, now of our Supreme Court, decided in 1930 while he was still president judge of one of the Common Pleas Courts of Philadelphia. The one similarity in the facts to those of the present case is found in the rapid and complete physical and mental disintegration of defendant in that case. He was a successful business man, living happily with his wife and family and upon friendly relations with Mr. and Mrs. Kennard. Unfortunately this friendship terminated in illicit relations with Mrs. Kennard, resulting in the breaking up of both homes. This continued for some years until in December 1929 Ritter had lost his money, his self-respect, ruined his health with alcoholic excesses, and seemed about to lose his mistress. After vainly trying to meet her for several days and lifting a revolver owned by him from a pawn shop, he followed her to the place of her employment

in a department store and after a short talk shot her where they stood, then followed her as she ran some distance until she fell, when he fired two more shots into her and killed her. He then fired two shots into his own body but recovered. Eyewitnesses said he was hysterical at the time, a very natural condition. There was no suggestion of insanity, or a weak-mindedness other than had naturally followed the circumstances under which they had lived for some few years and the excessive use of alcohol. He was indicted for murder and entered a plea of guilty, and the case was before the court to determine the degree of the crime, under the Act of 1925, supra, and to fix the penalty if it should be detemined to have been murder in the first degree.

After determining that the offense was murder in the first degree, the court remarks that the real question is the fixing of the penalty, since the death penalty is no longer the absolute and exclusive penalty in all cases. We give in many instances the substance of this opinion; in some the citations are verbatim and now follow. The opinion continues by stating that the problem is not one of law but one of penology, and that the court is acting as a jury and therefore not called upon to express the reasons by which it arrives at a conclusion. The crucial question involves the point of view, and what is the purpose or object in sentencing those convicted of crime. To this end all of the features and circumstances of the offense and the history of defendant must be considered. If the purpose is punishment, that is, retribution, retaliation, or vengeance, the facts must be considered from that angle. If the penalty is to act as a deterrent upon other potential violators of the law, a different study of the facts must be made. There must be a clear comprehension of the objects to be attained by the punishment. Then follows this statement:

"Generally speaking, there have been advanced four theories as the basis upon which society should act in imposing penalties upon those who violate its laws. These

are: (1) To bring about the reformation of the evil-doer; (2) to effect retribution or revenge upon him; (3) to restrain him physically, so as to make it impossible for him to commit further crimes; and (4) to deter others from similarly violating the law."

The court then dismisses the principle of reformation as having no application to such a case because, in either event, defendant will not again be in contact with society. The second theory of retribution is dismissed since we abandoned the idea of vindictive justice. It is true that the origin of legal punishments began in the natural impulse of revenge exercised by the survivors of the family, the tribe, and later of government. This theory is sustained by many citations of celebrated authors.

This brings us to the third theory, the restraint of the wrongdoer, in order to make it impossible for him to commit further crime. This is not only a justifiable basis for action but one vital to the protection of society and to permit one of dangerous criminal tendencies to be at freedom would be a folly equal to allowing a wild animal to range the streets at will. We quote:

"If, therefore, there is danger that a defendant may again commit crime, society should restrain his liberty until such danger be past, and, in cases similar to the present, if reasonably necessary for that purpose, terminate his life. Admittedly, restraint by imprisonment can never be as wholly effectual as execution, and there are, from time to time, cases where imprisonment may not be sufficient for the protection of society. . . .

"Examining the record of the present case from this point of view, in order to determine whether the defendant's continuation in life would be a lurking menace to society, I find nothing in the evidence which would lead to that conclusion. The murder which he committed was the result of many years of entanglement—a terrible tragedy, it is true, but one which was not the result of any bloodthirstiness or lust for crime. His record is that of a drunkard, with a resulting tendency toward quarrel-

someness, but, outside of the present case, he cannot fairly be characterized as a man of uncontrollable violence or of homicidal tendency or having any general enmity to the laws of society. As far as the necessity of his own restraint is concerned, I would conclude, therefore, that, by his incarceration in prison for the remainder of his life, society would be sufficiently protected from any further depredations on his part."

Coming then to the question of deterrence of others who might be tempted to commit the same offense, the court remarks that there is much controversy as to whether a death penalty is more effective than life imprisonment. The court then says:

"My own opinion is that the extreme penalty of death works a deterrent effect, and, therefore, should be aimed against cases where a murder is committed from what might be called a mental, rather than an emotional impulse—in other words, where the murder is deliberately planned from a sordid motive . . . Where, however, a murder is committed under the impulse of some frenzy or strong passion, or where it results from a mind weakened by long brooding over a social entanglement, or by alcoholism or the like, such person is not likely to be deterred by the example of a death penalty imposed upon those who committed similar offenses. Such murders are not the result of reasoning or of weighing considerations for or against the intended crime, and, therefore, they are not apt to be repressed by the force of example."

The court concludes its opinion with the following statement:

"In conclusion, it may be said that, perhaps, after all, the penalty of life imprisonment is not so much a substitute for capital punishment as a slower method of inflicting it."

Guided by the rules laid down in the cases above cited, we have now to consider briefly the facts before the court as to the further circumstances of the killing of Mr. Wentling, the life history of defendant as we have it up

to and after the killing, the observations which the court was able to make when defendant was in court for the various hearings. All of this has been considered by the court in determining whether or not defendant had the mental responsibility of a normal person.

Upon application of counsel for defendant, the court, on April 10, 1941, appointed Dr. Ira A. Darling, Superintendent of Torrance State Hospital, to make the examination and report contemplated by the Act of May 2, 1933, P.L. 224, secs. 1, 2, 19 PS §§1153-54, which provides that the report of such examination be furnished to the judge of said court to guide him in determining what disposition shall be made of defendant, and be available to counsel for defendant and the district attorney. Dr. Darling was known to the court to be a qualified psychiatrist, having great experience in mental cases during his employment for many years at Warren State Hospital as well as his later employment at the Torrance State Hospital and intermediate study and practice. On April 15, 1941, he duly examined defendant, having been furnished with histories of the case by the district attorney and counsel for defendant. This report was lodged with the court on April 22nd, the district attorney and counsel for defendant having access to it during the hearing in this case. In the course of his statements to Doctor Darling, defendant gave a portion of the statement as to the violent death of his father, stepmother and stepsister, stating that his grandfather, with whom he lived at that time, said that R. L. Wentling killed defendant's father on account of some estate settlement. Again defendant asserted, as he did at the hearing, that he killed Mr. Wentling "because he killed my father. He said he did." This alleged admission on the part of Mr. Wentling will be treated later.

From this report we quote the further significant sections:

"According to the Stanford Revision of the Binet-Simon test, he has a mental age of seven years and eight months.

"Emotions all seem very shallow and transient, yet easily influenced. His reasoning powers are distinctly childlike.

"He firmly believes that he had a personal right to inflict the death penalty for the murder of his father when the law failed to punish the one he considered guilty. He clearly showed that he differentiates between this personal right and a lawful act. Does not hesitate to say he knows what he did was against the law and usually punished by execution.

"A crossed hemiplegia affecting the left side and speech suffered in 1931 has caused physical and mental residuals which still exist.

"The mental residuals are defects of intelligence, lowered ability to perform mental work, emotional instability and poor reasoning capacity. (Mental age 7 to 8 years.)

"That his crime was incited by an adolescent or primitive form of reasoning based upon family talk and some casual statements of the victim—such reasoning being consistent with the mental age as determined by psychological tests.

"That the mental illness was a definite determining factor in precipitating the crime."

Generally the court is in agreement with the findings of Dr. Darling. Of course, we have no technical knowledge of the test by which he arrived at the mental age of defendant, although our observation has led us to the conclusion that defendant is subnormal and mentally comparable to a child of tender years.

In addition to the facts which have been detailed, connected more directly with the murder of R. L. Wentling, we have certain subsequent acts on the part of defendant which were heard for the purpose of understanding his real character. None of these facts tends to mitigate the offense here, because they were all of the most cruel and revolting character. They do, however, throw a light upon defendant's mentality and character.

Immediately following the shooting of R. L. Wentling and while Derolph and the two children were in the porch room, Derolph shot the boy, Ronald Lee Wentling, the bullet entering his head. The evidence here is very confused and confusing. Elizabeth Wentling, no doubt because of fright and fear, has no very clear recollection of what happened. Derolph says that the boy and Elizabeth, just after the father was shot, grappled with him and tried to get the revolver, but avers he did not know that the boy had been shot or had no knowledge of the shooting or just how it occurred. We do have the statement of Elizabeth that after she went upstairs with her father and mother Derolph came up to the room where they were and then went downstairs. Up to that time they could hear the boy moaning downstairs and then they heard a shot and the moaning ceased, but she did not see her brother after he was shot. When the boy was found he had two bullet wounds in his head and we conclude that Derolph fired the second shot and probably the fatal one at this time.

There followed an apparent aimless trip of Derolph up to the rooms where the remainder of the family were. Apparently at this time they fled, the father first, from the house through the upstairs window. Again Derolph came to the rooms occupied by Mrs. Wentling. Elizabeth had hurriedly locked the door and left the room as he was breaking in the door. The mother escaped to a neighbor's and Elizabeth was injured and tried to leave in a car. Derolph fired another shot, apparently frightening Elizabeth so that she ran into the ditch and stopped the car. Derolph came to the car then and this was followed by a criminal attack made by him upon Elizabeth and later by a second such attack. These are the principal facts of the barbarous and revolting acts of defendant at this time. A bare recital of them would call for extermination of defendant if the penalty were to be fixed upon the basis of vengeance. But they do show another angle of the mentality of this defendant. He exhibited the wild unreasoning rage of a feeble-minded person who suddenly finds

himself in a position of unlimited power and is without the control of a normal mind.

There are certain other facts and circumstances which are connected more or less with the killing of R. L. Wentling. We have mentioned the boyhood belief of Derolph that Mr. Wentling had killed his father some 28 years ago and when Derolph was probably about 14 years of age. He goes into the details of this killing when his stepmother, his stepsister, and his father met violent deaths. In a long, incoherent and rambling statement he pictures the exact manner in which he held that his victim had been the author of these deaths. Not only are his statements absolutely untrue but they are found to be absurd on their face. However, the photographic impression of this occurrence upon the mind of a boy, illiterate and not strong mentally, seemed very real to him. Here we note the apparent reality to defendant of the statements above mentioned as compared to the very evident unreality of a conversation which he alleged he had with Mr. Wentling at the barn just preceding the entrance to the house. He makes this statement to excuse the unprovoked murder. But it is a statement of a conversation that never happened, as appears from all the facts in the case. He says that he stated to Mr. Wentling: "Now Ruby, you killed my father." And that Mr. Wentling answered: "Well if I did, what are you going to do about it?" He further states that he said: "How did you kill my father?" And that Wentling answered: "I hit him with a piece of rubber." The statement continues further in detail, but the part given illustrates the absurdity of the statement.

Light upon defendant's mentality is shown by his movements preceding the killing. During the few days of his wanderings between Youngstown and the Wentling home, he tells one instance of coming into a large woods where he saw a lot of deer and of his desire to catch one particular deer, and that he continued chasing them about through the woods until he got lost and lay in the woods all night. Even in the simple statement of the facts of

his wanderings there is no continuity. His mind jumps from one thing to another.

He tells that after the murder he wandered about the countryside all night, throwing his overcoat away although it was cold and wet. To relieve himself of the charge of attempting an escape, he says he was returning this old revolver to Youngstown, Ohio, after which he intended to come back to the scene of the murder and give himself up.

Then we have the story of the attempted suicide in the county jail after his arrest. The details of his attempt are not clearly in evidence but there is sufficient to show that the plan was not that of a normal person. The attempt was made in the early morning hours and, although there was no interference, the defendant did not continue in his attempt but kept pacing his cell the rest of the night. He left in his cot a note addressed to someone by the name of Laura, relationship not known. The contents are of much the same character as his conversation. It was incoherent and meaningless. The peculiar circumstances under which it was written do not account for these characteristics. Of all defendant's acts after the murder, this attempted suicide was the only indication the court has been able to note of a normal reaction to the recollection of the awful offenses he had committed.

Listening to the testimony of defendant throughout the hearing in this case, observing him both as to the manner of his testifying and the subject matter of his testimony, inevitably leads to the conclusion that he is feeble-minded and not far removed from imbecility.

Now for a short review of his life history. His mother died when he was an infant. He made his home with his grandfather and his step-grandmother, the latter being "mean" to him, as he has stated. He thinks he completed the third grade in the public school. In his teens he suffered two more or less severe injuries to his head, one when he fell from a bicycle and the other when he was kicked by a horse. His first marriage resulted in the birth of two children, the wife dying very shortly after marriage. He married again and seems to have had some

years of fairly industrious and decent life, keeping up a comfortable home for himself and his wife at Oil City. This period of his life was ended the latter part of December 1930, when he was taken to the Oil City Hospital in an unconscious condition, a cerebral embolus resulting in a paralysis of his right side and a partial paralysis of his organs of speech. This condition continued until the latter part of January 1931, when he was discharged from the hospital as improved but not fully recovered. For about a month he stayed with his brother, continuing in substantially the same condition. We have the testimony of his brother and other relatives that from this time on there was a progressive change. He separated from his wife and has never had a home since that time. It was stated that his talk was irrational and incoherent. His self-respect gone, he was continuously ragged and so dirty that he was not admitted to the home of his uncle, and not welcome at the other homes of his relatives. When he was admitted, he had to be watched all the time, one reason being the danger of fire. He no longer could obtain regular employment but was only able to get odd jobs about a junk yard, sleeping there or in some "flop" house. So far as could be observed, he was usually with little or no money. When he did see certain of his relatives he told them impossible stories as to where he had been and what he was doing and what property he had.

Physically, defendant has improved somewhat since his stay in the hospital in January 1931. Mentally and morally, he seemed to have steadily deteriorated.

In his case there are no moral grounds which could be cited in his favor. He has reached the depths where he is absolutely immoral. Probably the term amoral would appear to express his present condition. There is no hope that he will ever be better in this respect. We have found and expressed his mental condition to be not far removed from imbecility and there is nothing to indicate future improvement there. It is only the fact that he cannot be held to the degree of responsibility of a normal person

that justifies the sentence of imprisonment for life rather than the death sentence.

This brings us to the question as to whether the requirement of restraint will be sufficiently met by sentencing him to imprisonment in the penitentiary for life. We feel that, under the circumstances, he will be finally removed from all association with the public generally. So long as this Commonwealth remains under a government by law, we cannot conceive that any governmental agency could be induced to release him by pardon or otherwise. This also assures the surviving members of the stricken family that they need not concern themselves or fear his return. Even should insanity develop, it could only result in his transfer to a proper hospital to treat that disease, and upon discharge he must be returned to the penitentiary, there to remain for and during the full term and period of his natural life.

As to whether the sentence of death would be a more effective deterrent to others who might be contemplating a similar offense, I express no opinion. We have the opinion of celebrated experts in the study of penology who claim to have investigated this subject, exploring the minds of those who were facing one or other of such sentences. A number of these opinions are to the effect that a life term is more dreaded than the electric chair. Again we call attention to the statement of Mr. Justice Stern in his opinion in Commonwealth v. Ritter, supra, to the effect that the penalty of life imprisonment is not so much a substitute for capital punishment as it is a slower method of inflicting it.

Probably we should not close this subject without calling attention to the fact that here we have no cunning plan on the part of this defendant for the commission of this murder. Everything was haphazard and no attempt made to conceal the murder. There is not even any plan to his attempted escape, just an aimless wandering about until he was apprehended. Therefore, under all the circumstances, we feel that the fitting penalty in this case is imprisonment for life and it will be so ordered.